KILPATRICK TOWNSEND & STOCKTON LLP
LARRY W. MCFARLAND (Bar No. 129668)
LMcFarland@kilpatricktownsend.com
CHRISTOPHER T. VARAS (Bar No. 257080)
CVaras@kilpatricktownsend.com
9720 Wilshire Blvd PH
Beverly Hills, CA 90212-2018
Telephone: 310-248-3830
Facsimile: 310-860-0363

Attorneys for Plaintiff
CELGARD, LLC

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| IN RE: SUBPOENA TO KIA MOTORS AMERICA, INC.<br><br>In Connection With:<br><br>Celgard, LLC<br><br>v.<br><br>SK Innovation Col, Ltd.<br><br>Case No. 3:13-CV-00254-MOC-DSC<br>United States District Court<br>Western District of North Carolina | Civil Action No. 8:14-cv-00315-JLS(RNBx)<br><br>**EX PARTE APPLICATION TO COMPEL COMPLIANCE WITH SUBPOENA TO KIA MOTORS AMERICA, INC., OR FOR TRANSFER TO THE WESTERN DISTRICT OF NORTH CAROLINA; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Filing Date: March 4, 2014<br><br>Hearing Date: _____<br>Hearing Time: _____<br>Location: 411 W. Fourth Street<br>Santa Ana, CA 92701<br>Courtroom 10A |

**EX PARTE APPLICATION**

TO ALL KIA MOTORS AMERICA, INC. AND ITS COUNSEL, AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  Please take notice that as soon as it may be heard, pursuant to Federal Rule of Civil Procedure 45 and Local Rule 7-19 Celgard, LLC ("Celgard") shall and hereby does request that the United States District Court for the Central District of California enter an *ex parte* order:

1.  Compelling Kia Motors America, Inc. ("KMA") to comply with Requests to Permit Inspection and for Production of Things Nos. 1 and 2 in the subpoena attached as Exhibit A to the Declaration of Lance Lawson filed herewith no later than noon Pacific Standard Time on Thursday, March 6, 2014; or, in the alternative

2.  Transferring this Application to the United States District Court for the Western District of North Carolina pursuant to Fed.R.Civ.P. 45(f).

**CONTACT INFORMATION AND NOTICE TO OPPOSING COUNSEL**

To the best of Celgard's knowledge, counsel for KMA in this matter is:

| | |
|---|---|
| Jeffrey Abraham | Charles Suh |
| Finnegan, Henderson, Farabow, | Finnegan, Henderson, Farabow, |
| Garrett & Dunner, LLP | Garrett & Dunner, LLP |
| 901 New York Avenue, NW | Two Freedom Square |
| Washington, DC 20001-4413 | 11955 Freedom Drive |
| 202.408.4000 | Reston, VA 20190-5675 |
| Jeffrey.Abraham@finnegan.com | 571.203.2700 |
| | charles.suh@finnegan.com |

Mr. Abraham and Mr. Suh are also counsel for defendant SK Innovations Co., Ltd. ("SKI").

Counsel for Celgard served counsel for KMA and SKI with Celgard's Notice of Intent to File *Ex Parte* Application and initiating documents for the above-captioned matter by email at 7:24 PM Pacific Standard Time on Friday, February 28, 2014.  (Declaration of Christopher Varas ("Varas Decl."), Ex. A, pp. 5-6.) KMA's counsel acknowledged service of the Notice by email at 7:15 PM Pacific Standard Time on Sunday, March 2, 2014, and indicated that KMA would oppose

1    Celgard's Application.  (*Id.*, p. 5.)  Celgard's counsel also called counsel for KMA

2    and SKI shortly after 7:00 AM Pacific Standard Time/10:00 AM Eastern Standard

3    Time on Monday, March 3, 2014 and left voice messages for Mr. Abraham and Mr.

4    Suh giving oral notice of this Application, and followed up with an email

5    confirmation.  (*Id.*, ¶ 3; Ex. A, p. 5.)

6

7

8    DATED:  March 3, 2014          Respectfully submitted,

9                                  KILPATRICK TOWNSEND & STOCKTON
                                    LLP

10

11                                 By: _____

12                                     LARRY W. MCFARLAND

13                                 Attorneys for Plaintiff
                                    Celgard, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ................................................................................. 1

II. FACTUAL BACKGROUND .............................................................. 2

III. PROCEDURAL HISTORY ................................................................. 3

    A. Celgard's Prior Subpoena to KMA and KMA's Initial Promise to Comply. ............................................................. 3

    B. Celgard's Current Subpoena to KMA and Celgard's First Notice of an *Ex Parte* Application in this Court. ..................... 5

IV. ARGUMENT ..................................................................................... 10

    A. Celgard's Requested Discovery Is Relevant ............................ 10

    B. Celgard Needs the Requested Discovery to Oppose SKI's Motion To Dismiss. ....................................................... 10

    C. KMA Cannot Demonstrate any Meaningful Hardship or Other Valid Objection to the Subpoena. ................................ 11

        1. KMA's Vague Objections Based On Confidentiality And The Korean Statute Are Meritless. ...................................................................... 11

        2. The Time Frame For The Inspection Is Reasonable. .................................................................... 12

        3. The Inspection Would Not Impose Any Other Undue Burden On KMA. ................................................... 13

    D. *Ex Parte* Relief Is Appropriate ............................................. 15

    E. In The Alternative, This Application Should Be Transferred To The Western District Of North Carolina. .............................................................................. 16

V. CONCLUSION ................................................................................. 17

<u>**TABLE OF AUTHORITIES**</u>

**PAGE**

**Cases**

*A. Farber & Partners, Inc. v. Garber,*
   234 F.R.D. 186 (C.D. Cal. 2006) ........................................................................13

*Gonzales v. Google, Inc.,*
   234 F.R.D. 674 (N.D. Cal. 2006) .......................................................................10

*Heat and Control, Inc. v. Hester Industries, Inc.,*
   785 F.2d 1017 (Fed. Cir. 1986) .........................................................................10

*McCoy v. Sw. Airlines Co., Inc.,*
   211 F.R.D. 381 (C.D. Cal. 2002) .......................................................................15

*Mission Power Eng'g Co. v. Cont'l Cas. Co.,*
   883 F. Supp. 488 (C.D. Cal. 1995) ....................................................................15

*Nat'l Acad. of Recording Arts & Sciences, Inc. v. On Point Events, LP,*
   256 F.R.D. 678 (C.D. Cal. 2009) .......................................................................11

**Rules**

Fed.R.Civ.P. 45(f) ...............................................................................................16

W.D.N.C. Local Patent Rule 2.2 .........................................................................12

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Celgard, LLC ("Celgard"), urgently requests this Court's assistance to enforce a Rule 45 subpoena that Celgard has properly served on third party Kia Motors America, Inc. ("KMA"). This is the third time Celgard has been forced to invoke emergency relief from a United States District Court to compel compliance with its valid subpoena to KMA.

Celgard has filed a lawsuit in the Western District of North Carolina ("SKI lawsuit") alleging that battery "separator" components manufactured by defendant SK Innovation Co., Ltd. ("SKI") infringe a patent owned by Celgard. SKI moved to dismiss Celgard's complaint for lack of personal jurisdiction and has claimed, among other things, that it has no knowledge of what products its infringing battery components are used in. The Court in North Carolina ordered jurisdictional discovery to be completed by March 14, 2014. The subject of this application is a subpoena that Celgard served on KMA to determine whether the SKI battery separator at issue in Celgard's lawsuit is present in the KMA 2015 Kia Soul EV automobiles that were unveiled, publicly displayed, and used at the 2014 Chicago Auto Show and will be sold throughout the United States beginning later this year. Publicly available information from a number of sources indicates that the entire battery system – including the battery separator – for the 2015 Kia Soul EV was designed, manufactured, and sold by SKI to KMA in what has been a three-year special joint development project. The presence of SKI's battery separator in the SKI battery that is used in the 2015 Kia Soul EV would be further evidence strongly supporting jurisdiction over SKI in the SKI lawsuit. This evidence also would directly contradict and rebut SKI's primary defense that it does not know for which consumer products its battery separators are intended.

Celgard files this *ex parte* application as a last resort. Celgard has worked with KMA in good faith for nearly a month to schedule the inspection specified in

1   its subpoena to KMA.  But KMA – which is represented by the same counsel as

2   defendant SKI – has exploited Celgard's good faith by repeatedly promising to

3   permit the inspections specified in Celgard's subpoena, only to renege at the last

4   minute.  At this point it is clear that KMA's strategy is to help SKI "run out the

5   clock" on jurisdictional discovery by continuing to promise compliance but never

6   actually permitting the inspection to occur.  Facing irreparable prejudice from this

7   emergency that is not of its own making, Celgard urgently seeks this Court's

8   assistance in compelling KMA to permit the inspections to which Celgard is

9   entitled.

10  **II.     FACTUAL BACKGROUND**

11          On April 25, 2013, Celgard filed a Complaint for Patent Infringement against

12  SKI in the Western District of North Carolina alleging that SKI infringed U.S.

13  Patent No. 6,432,586 (the "'586 patent"), entitled "Separator for a High Energy

14  Rechargeable Lithium Battery."  (Declaration of Lance Lawson ("Lawson Decl."),

15  Exh. B, pp. 13-30.)

16          SKI has moved to dismiss Celgard's lawsuit for lack of personal jurisdiction.

17  (Lawson Decl., Exh. C, pp. 32-36.)  Prior to ruling on SKI's motion, the District

18  Court in North Carolina authorized Celgard to conduct limited discovery including,

19  among other issues, "Kia Motors America, Inc.'s use, sale, and offer for sale in the

20  U.S. of electric drive vehicles incorporating SKI's Accused Lithium Ion Battery

21  Separators." (*Id.*, p. 35.)  The Court emphasized the importance of this discovery to

22  the "stream of commerce standard [the Court will be applying] in determining

23  whether to assert personal jurisdiction over" SKI.  (*Id.*)  Accordingly, the North

24  Carolina court has expressly authorized Celgard to seek the third party discovery

25  from KMA that Celgard requests in this Application.

26          The Court previously extended the jurisdictional discovery deadline to

27  March 14, 2014.  (*Id.*, Ex. D, pp. 38-39.)  That deadline remains in effect.

28  / / /

On Thursday, February 6, 2014, KMA made the world-debut of its 2015 Kia Soul EV vehicle at the Chicago Auto Show. (Lawson Decl., Ex. E, pp. 41-45.) The Kia Soul EV is an all electric vehicle (EV) that relies exclusively on electric battery power. Based on multiple press reports, Celgard understands that the Kia Soul EV uses batteries supplied by SKI. According to KMA's February 6 press release, the battery cells in the Kia Soul EV "use a gel electrolyte, and each cell contains ceramic separators to significantly improve thermal stability and safety." (*Id.*, p. 42.) In addition, KMA stated it intends to market and sell the Kia Soul EV worldwide and will begin selling directly to consumers in the United States in the third quarter of this calendar year. (*Id.*, p. 41.) Celgard seeks discovery from KMA sufficient to determine whether the "ceramic separators" used in the 2015 Kia Soul EV battery are the same separators at issue in Celgard's lawsuit against SKI, which is directly relevant to Celgard's stream of commerce theory of personal jurisdiction.

## III.  PROCEDURAL HISTORY

### A.  Celgard's Prior Subpoena to KMA and KMA's Initial Promise to Comply.

The subpoena at issue in this Application is the second inspection subpoena that Celgard has served on KMA. Celgard originally served KMA with a subpoena the day after KMA's February 6, 2014 public unveiling and press release announcing the world debut of the 2015 Kia Soul EV at the Chicago Auto Show. (Lawson Decl., Ex. F, pp. 47-53.) That subpoena contained the following requests:

1. Inspection of Kia Soul EV vehicle that is being displayed, marketed, offered for sale, or otherwise shown at the 2014 Chicago Auto Show at McCormick Place, 2301 S. Lake Shore Drive, Chicago, Illinois 60616.

2. Produce one complete battery pack or module used in any Kia Soul EV vehicle being displayed, marketed, offered for sale, or otherwise shown at the 2014 Chicago Auto Show at McCormick Place, 2301 S. Lake

1    Shore Drive, Chicago, Illinois, 60616.[1]

2    (*Id.*, p. 53.)  Given the short duration of the Chicago Auto Show and the fact that

3    Celgard did not know where KMA intended to move the vehicles after the show

4    ended, the subpoena specified an inspection date of February 11, although Celgard

5    was willing to inspect the vehicle at any time before KMA removed the vehicles

6    from Chicago.

7            After receiving service of the original subpoena, KMA's in-house counsel

8    initially promised to cooperate, stating in an email on February 7, 2014, "We are

9    willing to work with you to provide you with the discovery you seek and that you

10   are legitimately entitled to," but objected to the time frame for the inspection.

11   (Lawson Decl., Ex. G, p. 62.)  Counsel for Celgard agreed to work with KMA on

12   timing for an inspection to occur "within a week to ten days[.]")  (*Id.*, p. 61.)  Over

13   the next two days, KMA represented to Celgard that "we have a couple of pre-

14   production vehicles that can have their batteries pulled in 15-20 minutes.  Subject to

15   our consent, you can pretty much do it any time next week" and "my expectation

16   would be that a batter[y] would be made available to you in Irvine by the end of this

17   coming week" (*i.e.* the week of February 10-14).  (*Id.*, pp. 58-59.)

18           On February 10, KMA – which by then had retained SKI's counsel – reversed

19   course and announced it would not comply with Celgard's subpoena.  (Lawson

20   Decl., Ex. G, pp. 55-56.)  Instead, KMA served objections to the subpoena at or

21   around 11:00 p.m. on the evening of February 10, 2014, suddenly claiming that the

22   inspection it had previously agreed to would be burdensome and would disclose

23   purportedly trade secret information.  (*Id.*, Ex. H, pp. 68-73.)  KMA's new

24   objections also referred vaguely to the possibility that the inspection might implicate

25   a Korean law relating to the confidentiality of "National Core Technology," and

26   asserted cryptically that "Battery Management Systems in Electronic Vehicles may

27   _____

28   [1] Celgard has always been, and remains, willing to purchase the battery pack from
     KMA.  (*See* Lawson Decl., Ex. G, p. 58.)

1    be considered a National Core Technology." (*Id.*, pp. 69, 71-72.)

2            Celgard filed an emergency motion to compel compliance with the subpoena

3    in the Northern District of Illinois on February 12, 2014. (*Id.*, Ex. I, pp. 76-86.)

4    After receiving notice of Celgard's motion, KMA assured Celgard that at least one

5    of the 2015 Kia Soul EV's on display at the Chicago Auto Show would be available

6    at KMA's headquarters in Irvine, California "through mid-March", and requested

7    that "in view of this" fact, Celgard withdraw its original subpoena and its pending

8    motion in the Northern District of Illinois. (*Id.*, Ex. K, p. 109.) Relying on KMA's

9    renewed assurances of cooperation, Celgard served a confirming subpoena on KMA

10   for an inspection to occur at KMA's headquarters in Irvine and withdrew its motion

11   and subpoena in Illinois the following day. (*Id.*, Ex. A, pp. 5-11; Ex. K, p. 107-08.)

12       **B.     Celgard's Current Subpoena to KMA and Celgard's First Notice**

13           **of an *Ex* Parte Application in this Court.**

14           Pursuant to the parties' discussions regarding the Illinois subpoena and

15   motion, Celgard served its confirming subpoena on KMA on Friday, February 14,

16   2014. (Lawson Decl., Ex. A, pp. 5-11; Ex. K, p. 107-08.) The subpoena specified

17   an inspection date of February 21, 2014. (*Id.*, Ex. A, p. 5.) Celgard's counsel also

18   requested that counsel for KMA confirm that the inspection would go forward on

19   February 21, 2014. (*Id.*, Ex. K, p. 107.) KMA's counsel did not respond.

20           Celgard requested confirmation again on Wednesday, February 19, 2014.

21   (Lawson Decl., Ex. K, p. 106.) At 3:28 p.m. on February 19, KMA's counsel

22   notified Celgard that KMA would not permit the inspection to occur on February 21

23   as specified in the subpoena. (*Id.*) KMA stated that it was still "investigating the

24   Korean law issue." (*Id.*) KMA offered no alternative dates, and no time frame for

25   confirming whether it would comply with Celgard's (second) subpoena. (*Id.*) KMA

26   subsequently served objections to Celgard's second subpoena that were substantially

27   the same as its objections to Celgard's original subpoena.[2]   (*Id.*, Ex. J, pp. 88-94.)

28   _____

[2] KMA revised its objections to assert that "Battery Management Systems in

Faced with KMA's refusal to provide any information about whether or when it would provide Celgard with the discovery to which KMA acknowledges Celgard is entitled, Celgard's counsel wrote to counsel for KMA/SKI on February 20, 2014, demanding that KMA confirm that it would comply with the subpoena. (Lawson Decl., Ex. K, p. 105-06.)  Once again, KMA's counsel did not respond.  Celgard gave KMA notice pursuant to Local Rule 7-19 that Celgard would be filing an *ex parte* application with this Court on February 21, 2014.  (Varas Decl., Ex. B, pp. 8-11.)

### C.    KMA's Promise of Compliance to Dissuade Celgard from Seeking Relief from this Court and KMA's Subsequent Gamesmanship.

Shortly after Celgard gave KMA notice of its *ex parte* application, KMA's counsel wrote to Celgard's counsel stating in relevant part:

> KMA is willing to make battery cells available for a visual inspection at its California facility.  To the extent you feel it is necessary to remove one or more cells from the battery for destructive testing, KMA will allow you to do so. … We are still coordinating with KMA to find the best time for the inspection/removal of cells, but expect the date to be in the next 1-1.5 weeks, before the close of jurisdictional discovery.

(Lawson Decl., Ex. K, p. 104 (emphasis added).)  KMA's counsel also placed several conditions on the inspection, including stating that "Celgard will be responsible for removing the cells from the battery, and for any consequential damage, disposal of materials, personal injury or other associated costs from the removal of the cells" and that "KMA cannot permit the entire battery or entire battery modules themselves to be removed from the California facility for destructive testing." (*Id.*)

---

Electronic Vehicles 'are' considered a National Core Technology" but offered no further explanation of this cryptic objection despite having had nearly two weeks to "investigate" its basis.  (Lawson Decl., Ex. J, pp. 89, 91-92.)

1    Based on KMA's representation that it would permit the inspection to proceed

2    "in the next 1-1.5 weeks," Celgard refrained from filing its *ex parte* Application and

3    agreed to conduct the inspection on March 4, 2014 – giving KMA the full "1.5

4    weeks" it had requested and nearly a full month from the date Celgard served its

5    original subpoena on KMA.  (Lawson Decl., Ex. K, p. 103; Ex. F, p. 47; *see also*

6    Varas Decl., Ex. B, p. 8 (email from KMA's counsel requesting that Celgard advise

7    whether it intended to proceed with its *ex parte* filing "in view of the proposal"

8    KMA had presented to permit the inspection in the next "1 to 1.5 weeks.")  Celgard

9    also proposed that if KMA lacked the technical expertise to remove cells from its

10   own batteries (an assertion Celgard found surprising), Celgard would be willing to

11   "purchase the entire battery system and take it to a location where Celgard may

12   safely and securely remove the individual battery cells for testing."  (Lawson Decl.,

13   Ex. K, p. 103.)

14   Immediately after Celgard agreed not to file its *ex parte* application, KMA

15   began finding excuses not to permit the promised inspection.  KMA's counsel

16   rejected as a "non-starter" Celgard's offer to purchase the battery system, vaguely

17   referencing an unspecified "undue burden already described to you in earlier

18   communications."  (Lawson Decl., Ex. K, p. 101.)

19   When Celgard reiterated that it was "willing to work with KMA to produce

20   the batteries safely and securely on March 4" in accordance with KMA's prior

21   representation, KMA simply stonewalled:

22       KMA does not have trained technicians at the site where the car is

23       located that are capable of safely removing the individual cells from the

24       battery system.  Whether you consider this to be surprising is

25       irrelevant.   The removal of cells is indeed a delicate and dangerous

26       operation, and simply because KMA has the car does not mean it also

27       necessarily has the expertise in safely disassembling it.  We have been,

28       and continue to investigate this issue further.  If we receive additional

1    information, we will let you know.

2    (Lawson Decl., Ex. K, pp. 100-101.)

3         Celgard tried again to resolve the impasse by offering to conduct the

4    inspection "at KMA's facilities or a nearby Kia dealership with appropriate

5    facilities." (Lawson Decl., Ex. K, p. 99.)  Celgard also offered to have its own

6    personnel remove the cells and asked KMA to provide "an electronic copy of

7    the appropriate sections of the service manual for the 2015 Kia Soul EV so that

8    Celgard may safely and securely remove the battery cells from the EV" and

9    agreed to treat such documentation as Outside Counsel Eyes Only." (*Id.*)

10        But KMA continued to stonewall.  Notwithstanding the representation

11   by KMA's prior counsel that "we have a couple of pre-production vehicles that

12   can have their batteries pulled in 15-20 minutes," KMA's current counsel (who

13   as noted above also represent SKI) dismissed the possibility of an inspection at

14   a Kia dealership on the grounds that KMA supposedly has no "trained

15   technicians in the United States who can remove the battery pack[.]" (Lawson

16   Decl., Ex. G, p. 59; Ex. K, p. 98.)  Counsel also asserted that what KMA

17   previously characterized as a "15-20 minute" operation to remove the battery at

18   issue would now require "a substantial amount of disassembly" that might

19   "permanently damage" the automobiles. (*Id.*, Ex. G, p. 59; Ex. K, p. 98.)  As

20   for Celgard's offer to remove the cells itself with access to appropriate

21   documentation, KMA took the incredible position that "we do not currently

22   know if a service manual even exists[.]" (*Id.*, Ex. K, p. 98.)

23        Celgard would have been fully justified in seeking *ex parte* relief at that

24   point, but it tried yet again to resolve the impasse by offering to "pay for the

25   reasonable travel costs" of a KMA technician from "in the United States or

26   outside the United States" "to conduct such removal on March 4th in Irvine."

27   (Lawson Decl., Ex. K, p. 97.)  And in any event, if required, Celgard made it

28   very clear to KMA that Celgard was and always has been prepared to conduct

1   the inspection and remove the batteries with its own personnel or consultants

2   without any assistance from KMA.  All KMA needed to do was make the

3   vehicle available at or near where it is currently located at KMA's national

4   headquarters in Irvine.  (*Id.*)  As of this filing, KMA has not responded to

5   Celgard's offer to pay for a technician's travel expenses.  It has, however,

6   completely reneged on its February 21 agreement to permit the inspection in "1

7   to 1.5 weeks," and now claims that it will not even "be able to take a definite

8   position" on whether it will comply with the subpoena at all until at least the

9   end of the first week of March.  (*Id.*, p. 96.)

10          Nearly a month has passed since KMA represented that Celgard could

11   conduct the inspection "pretty much any time" the week of February 10.

12   (Lawson Decl., Ex. G, p. 59.)  More than two weeks have passed since KMA

13   enticed Celgard to withdraw its motion in the Northern District of Illinois by

14   representing that it would make the 2015 Kia Soul EV available in Irvine.  (*Id.*,

15   Ex. K, p. 107-09.)  Ten days have passed since KMA dissuaded Celgard from

16   filing its *ex parte* application by representing that the inspection could occur

17   "in the next 1 to 1.5 weeks" (*Id.*, p. 104.)  After a month of bait-and-switch

18   delay tactics, KMA now contends that this Application is "premature" because

19   it needs at least another week to "take a definite position" on whether it will

20   comply with Celgard's valid subpoena.  (*Id.*, p. 96; Varas Decl., Ex. A, p. 5.)

21          The time for games is over.  Celgard has done everything in its power to

22   address KMA's increasingly far-fetched excuses for denying Celgard the discovery

23   that KMA has already conceded Celgard is entitled to.  Faced with the looming

24   jurisdictional discovery cutoff and KMA's relentless gamesmanship, Celgard now

25   has no choice but to seek immediate relief from this Court to avoid the irreparable

26   prejudice it will suffer if KMA and SKI succeed in "running out the clock" on the

27   jurisdictional discovery period that closes on March 14.

28

EX PARTE APPLICATION TO ENFORCE SUBPOENA                                              - 9 -
CASE NO. 14-CV-00315-JLS(RNBX)

## IV.   ARGUMENT

The "'scope of discovery through a subpoena is the same as that applicable to Rule 34 and other discovery rules.'" *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679 (N.D. Cal. 2006), quoting Rule 45 advisory committee's note (1970)).  "A court determining the propriety of a subpoena balances the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena."  *Gonzalez*, 234 F.R.D. at 679, citing *Heat and Control, Inc. v. Hester Industries, Inc.*, 785 F.2d 1017, 1024 (Fed. Cir. 1986) (noting that "the court must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case." (internal quotations omitted).  All of these factors strongly favor Celgard, and KMA has no valid objection to the discovery specified in Celgard's pending subpoena.

### A.   Celgard's Requested Discovery Is Relevant.

There is no dispute that the information Celgard is seeking – whether SKI's allegedly infringing Separators have been placed into the stream of commerce as part of the 2015 Kia Soul EV – is relevant to SKI's motion to dismiss for lack of personal jurisdiction.  Indeed, the Court in North Carolina expressly ruled that such discovery is relevant, and KMA has also acknowledged that Celgard is "legitimately entitled to" the discovery requested in the subpoena.  (Lawson Decl., Ex. C, p. 35; Ex. G, p. 62.)

### B.   Celgard Needs the Requested Discovery to Oppose SKI's Motion To Dismiss.

There is also no dispute that Celgard needs the requested information to meaningfully oppose SKI's motion to dismiss.  The North Carolina Court has already explicitly ruled that the jurisdictional discovery requested by Celgard goes directly to the "stream of commerce standard in determining whether to assert personal jurisdiction over [SKI] … Thus, what products [SKI] placed upstream and its knowledge concerning the final destination of such products are all relevant to

1    the court's review" of SKI's motion to dismiss.  (Lawson Decl., Ex. C, p. 35.)

2    ## C.   KMA Cannot Demonstrate any Meaningful Hardship or Other
3    Valid Objection to the Subpoena.

4    Finally, KMA cannot point to any potential hardship that would justify

5    depriving Celgard of the information it needs to oppose SKI's motion, and none of

6    KMA's objections to the subpoena outweigh Celgard's need to confirm whether the

7    2015 Kia Soul EV contains the allegedly infringing Separator.

8    ### 1.   KMA's Vague Objections Based On Confidentiality And The
Korean Statute Are Meritless.

9    KMA objects to Celgard's subpoena because it would purportedly require

10   production of trade secret information in violation of Korean law.  (Lawson Decl.,

11   Ex. K, pp. 88-93.)   As an initial matter, this proposition is suspect because KMA

12   will soon offer the same 2015 Kia Soul EV for sale in the United States and already

13   sells in Korea the Kia Ray, which is an all-electric vehicle, very similar in size and

14   shape to the new Kia Soul EV.  Any buyer of the vehicle would be free to inspect or

15   disassemble the battery of the vehicle in the same way that Celgard requests in its

16   subpoena.  Notably, Celgard is not requesting permission to inspect KMA's

17   manufacturing facility that may be shielded from the public.  Rather, Celgard is only

18   requesting an inspection of a vehicle that is being publicly-marketed by KMA today

19   and will soon be on sale to the public in the United States.

20   Furthermore, KMA's vague assertion that the batteries it is preparing to sell to

21   the public by the thousands are "trade secrets" also fails because KMA has not

22   provided any basis for that dubious assertion, or any reason why such

23   unsubstantiated assertions permit it to withhold discovery it admits Celgard is

24   entitled to.  *See, e.g., Nat'l Acad. of Recording Arts & Sciences, Inc. v. On Point*

25   *Events, LP*, 256 F.R.D. 678, 681-83 (C.D. Cal. 2009) (noting that trade secret

26   information is routinely produced, and emphasizing the need for substantiation of

27   claims that relevant discovery is confidential or trade secret information).

28   / / /

1    Moreover still, any truly confidential information revealed during Celgard's

2    requested inspection would be protected under the Local Patent Rules for the

3    Western District of North Carolina that provide that disclosure of confidential

4    information produced before the court has issued a protective order "shall be limited

5    to each party's outside attorney(s) of record and the employees of such outside

6    attorney(s)." (W.D.N.C. Local Patent Rule 2.2.)  Notably, Celgard is willing to enter

7    a reasonable confidentiality agreement with KMA in order to obtain the discovery it

8    seeks under the subpoena.  But KMA has refused to permit the inspections that

9    Celgard requests even with these safeguards.

10   KMA's continuing vague references to the Korean "Act on Prevention of

11   Divulgence and Protection of Industrial Technology" is also unavailing.  KMA has

12   had nearly a month to explain how this statute could prohibit the "disclosure" of

13   batteries that KMA is preparing to sell to the American public, but it has never done

14   so.  Indeed, even three weeks after first invoking the statute to resist Celgard's

15   Illinois subpoena, KMA still is unable to provide any explanation for this objection

16   other than that it is still "investigating" it.  Given the parties' extensive discussions

17   since Celgard served its original subpoena on February 6, this bald assertion rings

18   hollow.

19   Finally, Celgard respectfully submits that KMA waived its confidentiality

20   objections to the inspection specified in the subpoena when it agreed to permit the

21   inspection after Celgard gave notice of its intent to seek *ex parte* relief on February

22   21.

23   **2.      The Time Frame For The Inspection Is Reasonable.**

24   KMA's objection to the time frame for the inspection are also meritless.  As

25   explained above, Celgard served its initial subpoena on KMA on February 7, and

26   served its current subpoena on KMA on February 14.  Celgard agreed to the outside

27   limit of KMA's "1-1.5" week time frame on February 21, setting the inspection for

28   eighteen days after service of the current subpoena, and twenty-five days after

1    service of the original subpoena.

2         KMA's objections to the time for the inspection are particularly improper in

3    this case because it was KMA that requested Celgard agree to conduct its inspection

4    in Irvine rather than Chicago, and KMA that specified the "1-1.5" weeks of

5    additional time to which Celgard agreed.  Moreover, the conclusory assertion by

6    counsel for KMA/SKI that the time for inspection is unreasonable because KMA

7    must "undergo extensive research or investigation of information" is belied by the

8    statements of KMA's prior counsel (*i.e.* counsel not representing SKI in the motion

9    to dismiss) that "we have a couple of pre-production vehicles that can have their

10   batteries pulled in 15-20 minutes.  Subject to our consent, you can pretty much do it

11   any time next week."  (Lawson Decl., Ex. J, pp. 89, 91-92; Ex. G, p. 59.)

### 3.    The Inspection Would Not Impose Any Other Undue Burden On KMA.

14        KMA also cannot credibly assert that Celgard's requested inspection would

15   impose any other form of undue burden on KMA.  The boilerplate assertions of

16   burden asserted throughout the remainder of the objections served by counsel for

17   KMA/SKI are neither credible nor specific enough to be entitled to any weight.  *See*

18   *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 188 (C.D. Cal. 2006) and

19   authority cited therein (discussing impropriety of unsubstantiated, boilerplate

20   objections based on burden and relevance).  Moreover, these objections also fail in

21   the light of KMA's own admissions that the battery Celgard seeks to inspect could

22   be "pulled in 15-20 minutes," that "you can pretty much do [the inspection] any

23   time next week."  (Lawson Decl., Ex. G, p. 59.)  KMA's boilerplate objections are

24   exactly what they appear to be – gamesmanship to "run out the clock" on the

25   jurisdictional discovery that the North Carolina court ordered over SKI's objections.

26        Finally, KMA's more recent excuses for noncompliance – including but not

27   limited to its incredible claim that it is incapable of disassembling its own battery

28   packs and has no documentation that could allow Celgard's personnel to remove the

battery cells safely – fail for several independent reasons.  First, the assertions of counsel for KMA and SKI are not credible in light of KMA's own prior statements before it hired SKI's counsel.  Having represented to Celgard in early February that the batteries in question can be removed "in 15-20 minutes" and that the inspection could be scheduled "pretty much . . . any time next week," KMA cannot credibly claim now that it knows of no personnel in the United States and no documentation that would enable KMA to disassemble its own battery, nor does KMA's claimed ignorance of its own product justify denying Celgard's personnel access to conduct the investigation required by the subpoena because Celgard is willing to purchase a battery pack from KMA and have Celgard's own personnel conduct the inspection.  (Lawson Decl., Ex. G, p. 59; Ex. K, pp. 96-103.)

Indeed, KMA's objections ring particularly hollow in this case, where Celgard has repeatedly offered to cooperate with KMA to mitigate any burden by, among other things:  (1) purchasing a battery pack (which KMA summarily rejected as a "non-starter"); (2) conducting the inspection at another Kia facility (which KMA rejected because it supposedly has no one in the United States capable of removing the cells it promised to make available); (3) using Celgard's own personnel to remove the cells based on KMA's technical documents (which KMA rejected because it claims not to know if any documentation exists that would allow Celgard's personnel to safely remove the cells); (4) using Celgard's own personnel to remove the cells without KMA's technical documents if KMA will make one of the 2015 Kia Soul EV's in its possession available to Celgard (which KMA refuses to do); and (5) paying the travel expenses of a KMA technician from outside the United States (which KMA has not acknowledged).  (Lawson Decl., Ex. K, pp. 96-103.)  Celgard's offers more than offset any of the dubious burdens KMA has raised since it retained SKI's counsel.

Finally, KMA's more recent excuses also fail for the independent reason that KMA waived them as the basis for any objection by not raising them in its formal

1   objections to either of Celgard's subpoenas.  *See McCoy v. Sw. Airlines Co., Inc.*,

2   211 F.R.D. 381, 385 (C.D. Cal. 2002) (Rule 45 requires "the recipient of a subpoena

3   to raise all objections at once, rather than in staggered batches, so that discovery

4   does not become a 'game.'")  KMA's waiver of these issues is particularly stark

5   because KMA did not raise them until <u>after</u> it dissuaded Celgard from seeking *ex*

6   *parte* relief on February 21 by agreeing to the inspection and representing that the

7   inspection could go forward in "1-1.5 weeks."  (*See* Lawson Decl., Ex. J, pp. 88-94;

8   Ex. K, pp. 96-103.)

9              **D.   *Ex Parte* Relief Is Appropriate**

10  *Ex parte* applications are appropriate in this District when "the moving

11  party's cause will be irreparably prejudiced if the underlying motion is heard

12  according to regular noticed motion procedures" and "the moving party is without

13  fault in creating the crisis that requires *ex parte* relief[.]"  *Mission Power Eng'g Co.*

14  *v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995).  Both requirements are

15  more than satisfied here.

16  First, Celgard will be irreparably prejudiced if its motion is heard according to

17  the regular noticed motion procedures because jurisdictional discovery closes on

18  March 14, 2014, a mere ten days from the end of KMA's promised "1-1.5 week"

19  time frame for the inspection.  (Lawson Decl., Ex. D, p. 38; Ex. K, p. 104.)  The

20  meet-and-confer/joint-stipulation motion process mandated by Local Rule 37 would

21  not permit Celgard to even file its motion before the jurisdictional discovery period

22  closes.

23  Next, Celgard is without fault in creating the instant crisis.  Celgard has

24  literally done everything in its power to avoid the need for Court intervention.

25  Celgard served its initial subpoena <u>one day</u> after KMA publicly unveiled and

26  announced the debut of the 2015 Kia Soul EV, and relied in good faith on KMA's

27  representations that "you can pretty much do [the inspection] any time next week."

28  (Lawson Decl., Ex. G, p. 59.)  When KMA retained SKI's counsel and reneged on

1   its agreement to permit the inspection, Celgard immediately sought relief in the

2   Northern District of Illinois, and acted in good faith not to waste the Illinois court's

3   time and resources when KMA represented that the cars Celgard wanted to inspect

4   would be available in Irvine.

5        When KMA suddenly announced that it would not permit the inspection in

6   Irvine after all, Celgard immediately took steps to seek *ex parte* relief from this

7   Court.  But when KMA represented that the inspection could occur within "1-1.5

8   weeks," Celgard appropriately decided not to waste this Court's time and resources

9   with an emergency motion that KMA would have opposed by claiming that it had

10  agreed to comply with the subpoena.  Over the past ten days Celgard has tried

11  diligently to address KMA's list of increasingly outlandish excuses for not

12  permitting the inspection it has repeatedly agreed to, but has been stymied at every

13  turn by KMA's incessant gamesmanship.

14       Celgard brings this application only as a last resort with precious little time

15  remaining in the jurisdictional discovery period, and with a record of <u>three</u> broken

16  promises by KMA to comply with Celgard's valid subpoena.  The record is now

17  clear that any assurance by KMA that it will permit the inspection is not credible,

18  and immediate Court intervention is required.

19       **E.    In The Alternative, This Application Should Be Transferred To
             The Western District Of North Carolina.**

20

21       The revised Rule 45(f) authorizes the Court to transfer this application to the

22  Western District of North Carolina, which issued the subpoena at issue.  (*See*

23  Lawson Decl., Ex. A, p. 5.)  The Court has authority to transfer the application even

24  over KMA's objection if there are "exceptional circumstances."  Fed.R.Civ.P. 45(f).

25  Celgard respectfully submits that there are exceptional circumstances in this case.

26       The advisory committee's notes to the 2013 amendments explain that the

27  "prime concern [weighing against transfer] should be avoiding burdens on local

28  nonparties subject to subpoenas[.]"  In this case there is no such concern because

1   KMA is being represented by the same counsel that is currently representing SKI in

2   the North Carolina court.  Nor is KMA an individual or a small entity that would be

3   burdened by appearing (through SKI's counsel) in North Carolina.  KMA is a

4   national automotive manufacturer that sells cars across the entire country and has

5   multiple dealerships in North Carolina, including the Western District of North

6   Carolina.

7        The committee notes also emphasize that transfer may be appropriate "in

8   order to avoid disrupting the issuing court's management of the underlying

9   litigation[.]"  Insofar as KMA has raised issues that are likely to arise throughout

10  this case – such as the purported Korean statute invoked in KMA's objections –

11  transferring this application will permit the North Carolina court to consider these

12  issues and address them in a manner that is consistent with its overall management

13  of the case and in particular the Court-ordered jurisdictional discovery.

14  **V.    CONCLUSION**

15       For the foregoing reasons, Celgard respectfully requests that the Court enter

16  an *ex parte* order compelling KMA to comply with Celgard's subpoena in the

17  manner stated in the Application above, or in the alternative transferring this

18  application to the United States District Court for the Western District of North

19  Carolina.

20

21  DATED:  March 3, 2014          Respectfully submitted,

22                                 KILPATRICK TOWNSEND & STOCKTON
                                   LLP
23

24                                 By: _____

25                                      LARRY W. MCFARLAND

26                                 Attorneys for Plaintiff
                                   Celgard, LLC
27

28

## DECLARATION OF SERVICE BY E-MAIL

### In Re Subpoena to Kia Motors America, Inc.

### U.S.D.C., Central Dist. of California, Case No.:   CV-14-1535 CAS (RZx)

I, the undersigned, say:

I am and was at all times herein mentioned a resident of King County, Washington, over the age of eighteen (18) years and not a party to the within action or proceeding. My business address is 1420 Fifth Avenue, Seattle, WA 98101. I am an employee of Kilpatrick Townsend & Stockton, LLP. At all times relevant herein I have acted under the direction of an attorney who is a member in good standing of the Bar of the United States District Court for the Central District of California.

On March 3, 2014, I served the following:

**EX PARTE APPLICATION TO COMPEL COMPLIANCE WITH SUBPOENA TO KIA MOTORS AMERIC, INC. OR FOR TRANSFER TO THE WESTERN DISTRICT OF NORTH CAROLINA; MEMORANDUM OF POINTS AND AUTHORITIES**

upon counsel named below by emailing a true and correct copy to the addresses specified below. Counsel specified below have confirmed in writing their agreement to accept service by e-mail.

| | |
|---|---|
| Jeffrey Abraham<br>Finnegan, Henderson, Farabow, Garrett & Dunner, LLP<br>901 New York Avenue, NW<br>Washington, DC 20001-4413<br>202.408.4000<br>Jeffrey.Abraham@finnegan.com | Charles Suh<br>Finnegan, Henderson, Farabow, Garrett & Dunner, LLP<br>Two Freedom Square<br>11955 Freedom Drive<br>Reston, VA 20190-5675<br>571.203.2700<br>charles.suh@finnegan.com |

1

**BY E-MAIL:** I sent said document via electronic transmission from my computer to counsel whose electronic mail address is listed above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 3, 2014, at Seattle, Washington.


SUSAN KLOTZ

2